RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0074p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

───────────────

LUTFI SAID SAALIM,

>                                    *Plaintiff-Appellant,*

> *v.*                                                          No. 23-3217

WALMART, INC.; WAL-MART STORES EAST, LP; LUCAS COUNTY
BOARD OF COMMISSIONERS, on behalf of Lucas County, Ohio;
SHERIFF MICHAEL J. NAVARRE, in his official capacity as Lucas
County Sheriff; DEPUTY SHERIFFS JEFFREY M. BRETZLOFF and
JUSTYN MCNETT, in their individual and official capacities,

>                                    *Defendants-Appellees.*

───────────────

Appeal from the United States District Court for the Northern District of Ohio at Toledo.
No. 3:21-cv-01481—James R. Knepp II, District Judge.

Argued: January 10, 2024

Decided and Filed: April 3, 2024

Before: BATCHELDER, CLAY, and GIBBONS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Thomas J. Walsh II, KISLING NESTICO & REDICK, LLC, Akron, Ohio, for Appellant. Taylor C. Knight, REMINGER CO., L.P.A., Toledo, Ohio, for Walmart Appellees. Kevin A. Pituch, LUCAS COUNTY PROSECUTOR'S OFFICE, Toledo, Ohio, for Lucas County Appellees. **ON BRIEF:** Thomas J. Walsh II, KISLING NESTICO & REDICK, LLC, Akron, Ohio, Hassanayn M. Joseph, JOSEPH LAW, LTD., Toledo, Ohio, for Appellant. Taylor C. Knight, Hannah R. Duschl, REMINGER CO., L.P.A., Toledo, Ohio, for Walmart Appellees. Kevin A. Pituch, Denny A. Lyle, Andrew K. Ranazzi, LUCAS COUNTY PROSECUTOR'S OFFICE, Toledo, Ohio, for Lucas County Appellees.

CLAY, J., delivered the opinion of the court in which GIBBONS, J., joined, and BATCHELDER, J., joined in part. BATCHELDER, J. (pp. 28–31), delivered a separate opinion concurring in part and dissenting in part.

---------------

**OPINION**

---------------

CLAY, Circuit Judge.  Plaintiff Lufti Said Saalim appeals the district court's two orders granting judgment on the pleadings in favor of Defendants Jeffrey Bretzloff, Justyn McNett, Michael Navarre, and the Lucas County Board of Commissioners, and *sua sponte* dismissing Defendants Walmart, Inc. and Wal-Mart Stores, East, LP.  Saalim alleged violations of his Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983 and also asserted various violations of Ohio state law.  For the reasons set forth below, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** the case for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.  Factual Background

On April 12, 2020, Saalim drove two individuals in his cab to a Walmart Supercenter in Toledo, Ohio to pick up prescriptions.  After dropping off his riders, he waited in a loading zone for them to return from the pharmacy.  While parked, a Walmart employee approached him, and Saalim told this employee that he was parked while waiting for his riders to return from the pharmacy.  Shortly after this interaction, Bretzloff, who was working as a private security guard for Walmart while wearing his full sheriff's uniform,[1] approached Saalim's car.  According to the later-filed police report, the Walmart employee had asked Bretzloff to approach Saalim.

Bretzloff greeted Saalim, and for approximately the first thirty seconds of their encounter, Bretzloff and Saalim engaged in a back and forth as to whether Saalim would produce his driver's license for inspection.  Bretzloff first asked Saalim if he had a license.  Saalim replied that he did, and asked Bretzloff why he needed it.  Bretzloff responded "[be]cause now I'm now contacting you so now I need to see your driver's license." Compl., R. 1, Page ID #12.  Once

---

[1]The complaint alleges that, at all relevant times, Bretzloff was wearing his official uniform from the Lucas County Sheriff's Office, including his badge, and carried weapons provided by the Sheriff's Office, including a taser, firearm, baton, and mace.  The complaint also alleges that, at all relevant times, Bretzloff was working for Walmart.

again, Saalim asked why Bretzloff needed to see his license. In response, Bretzloff told Saalim that he would make the encounter an "official stop" if Saalim did not cooperate and produce his license. *Id.* at Page ID #13. Bretzloff then told Saalim that he was asked to approach the cab because Saalim was parked in a no-parking zone. Saalim explained that he was waiting on his riders to pick up prescriptions; and again, Bretzloff asked him for his identification. Saalim eventually indicated that he would produce his identification, but again asked why Bretzloff needed it.

A little over thirty seconds into the interaction and without a verbal warning to Saalim, Bretzloff opened the driver's side door of Saalim's cab, grabbed his left arm with both hands, and attempted to remove him from the cab. Saalim then asked Bretzloff to stop forcing him out of the cab, and asked Bretzloff what he had done wrong. Bretzloff then drew his taser, pointed it at Saalim, and yelled at Saalim to get out of the cab. Saalim remained in the cab, and Bretzloff warned that he would tase him. Saalim got out of the cab about a minute after the interaction had begun.

When Saalim exited the car, Bretzloff "shoved him to the side" of the cab. *Id.* at Page ID #14. Saalim turned to Bretzloff to continue asking Bretzloff what he had done wrong, and Bretzloff pushed his taser into Saalim's abdomen and yelled "stop resisting!" *Id.* While Saalim's hands were on top of the cab, and his back was facing Bretzloff, Bretzloff pulled out handcuffs. At this point, Bretzloff's body camera became detached and fell to the ground face-up. It continued to film from the ground. Saalim apparently turned to face Bretzloff again, as the complaint alleges that Saalim was "standing against" the cab "in a non-threatening pose with both hands visible and empty." *Id*. at Page ID #15  Bretzloff then tased Saalim for approximately nine seconds. Saalim fell backwards into the cab. After the nine seconds, Bretzloff again yelled "stop resisting!" to which Saalim responded, "I'm not resisting!" *Id.*

Bretzloff then tased Saalim again, this time, in drive-stun mode.**[2]** This happened approximately eight seconds after the first tasing. Bretzloff tased Saalim for about seven

---

**[2]**The parties do not define the term "drive stun," nor do they identify the model of taser. Generally, a taser can be used in "dart mode" or "drive-stun mode." *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 492 (6th Cir.

seconds, during which time Saalim screamed in pain and exclaimed multiple times that he was a diabetic. Immediately after tasing him, Bretzloff again yelled "stop resisting!" to which Saalim replied, "I'm not resisting!" *Id.* Bretzloff then placed Saalim in handcuffs. When Saalim was in handcuffs, Bretzloff yelled at him to "sit down" and then forced him to the ground, causing Saalim to cry out in pain. *Id.* at Page ID #16.

At no point in this approximately three-minute interaction did Bretzloff tell Saalim that he was under arrest. After sitting on the ground while handcuffed, Saalim asked Bretzloff why he was arrested, to which Bretzloff replied "first of all, resisting arrest." *Id.* Eventually, Saalim was put in the back of a police car, and, after emergency medical services attended to him at the scene, he was transported to a hospital for medical care before being detained at the Lucas County Corrections Center.

Saalim was charged with menacing, resisting arrest, obstructing official business, and a parking violation. The menacing charge was reduced to disorderly conduct, and all other charges were dismissed. Saalim pleaded no contest to the disorderly conduct charge. After Saalim's plea, the Lucas County Sheriff's Office Internal Affairs Bureau investigated the incident between Bretzloff and Saalim, and found that Bretzloff had violated the Sheriff's Office use of force policy.

## B. Procedural History

On July 29, 2021, Saalim filed his complaint against six named Defendants: (1) Walmart, Inc.; (2) Wal-Mart Stores, East, LP; (3) the Lucas County Board of Commissioners, on behalf of Lucas County; (4) Michael Navarre, in his official capacity as Lucas County Sheriff; (5) Bretzloff; and (6) Justyn McNett, a member of the Lucas County Sheriff's Office and the coordinator of Bretzloff's work at Walmart. Against Bretzloff individually, he brings a claim under 42 U.S.C. § 1983 for the violation of his Fourth and Fourteenth Amendment rights and state law claims for assault, battery, false arrest and imprisonment, and intentional infliction of emotional distress. He also alleges derivative claims against the other Defendants. Namely, he

---

2012). In "dart mode," the taser shoots two darts connected to wires at the target. *Id.* In "drive-stun" mode, the taser is applied directly to the target. *Id.*

brings a § 1983 municipal liability claim against Sheriff Navarre and the Lucas County Board of Commissioners and state law claims for negligent hiring, supervision, training and retention, and vicarious liability against Walmart, Inc. and Wal-Mart Stores, East, LP (the "Walmart Defendants") and McNett. Finally, he alleges a separate cause of action for punitive damages under Ohio law against Bretzloff, McNett, and the Walmart Defendants. In essence, Saalim's complaint alleges federal and state law claims against Bretzloff, a § 1983 municipal liability claim against Sheriff Navarre and Lucas County Board of Commissioners, and derivative state law claims against the Walmart Defendants and McNett.

All named parties filed answers to Saalim's complaint, one on behalf of the Lucas County Defendants—Bretzloff, Navarre, McNett[3] and the Lucas County Board of Commissioners—and one on behalf of the Walmart Defendants. The Lucas County Defendants filed their first motion for judgment on the pleadings at the same time as their answer. In this motion, they argued that the Lucas County Board of Commissioners was entitled to judgment on the pleadings because it did not supervise the Sheriff's Office, and that Bretzloff was entitled to judgment on the pleadings as to Saalim's false arrest and imprisonment claims because they were barred by Saalim's no contest plea to disorderly conduct. The district court granted the motion, and, on appeal, Saalim has only challenged the district court's decision as to the false arrest and imprisonment claims.

The Lucas County Defendants then filed a second motion for judgment on the pleadings seeking dismissal of the remainder of Saalim's claims against them. They argued that (1) Bretzloff was entitled to qualified immunity against Saalim's claim under § 1983; (2) Saalim's remaining state law claims—assault, battery, and intentional infliction of emotional distress—were barred by the statute of limitations; (3) all claims against Navarre and McNett should be dismissed because they were derivative of Saalim's claims against Bretzloff; and (4) the punitive damages claim should be dismissed because it is a remedy, not a cause of action. The district court granted the motion and dismissed the remaining claims against the Lucas County Defendants. The district court also *sua sponte* dismissed the Walmart Defendants,

---

[3]Although the claims asserted against McNett relate to his work with Walmart, he is represented by attorneys working for Lucas County in this appeal.

reasoning that all of Saalim's claims against them depended on finding Bretzloff liable for an underlying violation. Saalim timely appealed both of the district court's decisions on the two motions for judgment on the pleadings.

## II. DISCUSSION

### A. Standard of Review

Federal Rule of Civil Procedure 12(c) permits a party to file a motion for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." This Court reviews *de novo* a decision on a motion for judgment on the pleadings. *Moderwell v. Cuyahoga Cnty.*, 997 F.3d 653, 659 (6th Cir. 2021) (citing *Moore v. Hiram Twp.*, 988 F.3d 353, 357 (6th Cir. 2021)). We review decisions on these motions using the same standard that applies to motions to dismiss. *Id.* That is, "all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Id.* (quoting *Jackson v. Prof'l Radiology Inc.*, 864 F.3d 463, 466 (6th Cir. 2017)). Just as in a review of a motion to dismiss, "we 'need not accept as true legal conclusions or unwarranted factual inferences.'" *Id.* (quoting *Jackson*, 864 F.3d at 466).

### B. Analysis

#### 1. Video Evidence

Initially, we must clarify which facts we can consider on this appeal. When reviewing a motion for judgment on the pleadings, we generally may only review the pleadings, any attachments to those pleadings, and documents that are "referred to in the complaint and [are] central to the plaintiff's claim" or are "matters of public record." *Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999) (citation omitted); *Com. Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007); *see also* Fed. R. Civ. P. 10(c). In this case, Defendants urge us to consider body camera video of the April 12, 2020 interaction in part because the factual allegations in the complaint clearly reference the video by citing it and incorporating time stamps from it. To be sure, we have acknowledged that where a complaint

even "implicitly relies on [a] video[]" it can make sense to consider it even at an early stage of litigation. *Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022). This is particularly true when determining whether qualified immunity applies, as qualified immunity is a complete defense to not just liability, but to litigating the suit itself, making early resolution central to the protection it offers. *Id.*

Nevertheless, we have consistently held that we may only consider the video footage over the pleadings when "the videos are clear and 'blatantly contradict[]' or 'utterly discredit[]' the plaintiff's version of events." *Id.* (alterations in original) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *see also Brown v. Giles*, 95 F.4th 436, 440–41 (6th Cir. 2024); *Akima v. Peca*, 85 F.4th 416, 422 (6th Cir. 2023). This is because if a video clearly depicts a set of facts contrary to those alleged in the complaint, this makes a plaintiff's allegations implausible. *See Bailey v. City of Ann Arbor*, 860 F.3d 382, 387 (6th Cir. 2017). But when the video does not blatantly contradict or utterly discredit the complaint, we do not consider it on Rule 12 motion. Instead, as when assessing any motion made under Rule 12, we rely on the allegations in the pleadings alone. *Akima*, 85 F.4th at 422 ("[A]t the motion to dismiss stage we 'rely on the videos over the complaint' only 'to the degree the videos are clear and "blatantly contradict" or "utterly discredit" the plaintiff's version of events.'" (quoting *Bell*, 37 F.4th at 364)); *see also Osberry v. Slusher*, 750 F. App'x 385, 390–91 (6th Cir. 2018) (declining to consider a video on a motion for judgment on the pleadings when the video did not "utterly discredit" the complaint's version of events).

Upon review, the body camera footage in this case does not blatantly contradict the allegations in the complaint; instead, the complaint faithfully describes the account depicted in the video footage, even using time stamps to denote the corresponding portions of the video it discusses. As the Walmart Defendants even concede, "the video is wholly consistent with the complaint." Walmart Def.'s Br., ECF No. 30, 20 n.4 (emphasis omitted). For this reason, the district court erred in considering it, and we do not consider it on appeal.**[4]**

---

**[4]**The dissent suggests that we should consider the video because it has been admitted into the record and because the dissent believes that it is "dispositive" of the issues in the case. Dissenting Op, at 30. To be sure, the video will likely be important evidence in either a later summary judgment motion or in a trial. However, as we

### 2. Qualified Immunity

Bretzloff claims that he is entitled to qualified immunity on Saalim's § 1983 Fourth Amendment claim against him. Although a defendant "'bears the burden of pleading' a qualified immunity defense," it is ultimately the plaintiff's burden to show why the defendant is not entitled to qualified immunity. *Palma v. Johns*, 27 F.4th 419, 427 (6th Cir. 2022) (quoting *Estate of Hill v. Miracle*, 853 F.3d 306, 312 (6th Cir. 2017)). To overcome the defense of qualified immunity in a motion for judgment on the pleadings, the complaint must plausibly allege facts showing that the official violated a plaintiff's constitutional rights—here, that Bretzloff used excessive force in violation of the Fourth Amendment—and that this right was clearly established at the time of the violation. *Moderwell*, 997 F.3d at 659–60 (citing *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020)).

We have noted that "it is generally inappropriate" to find an officer entitled to qualified immunity at the early stage of a Rule 12 motion. *Id.* at 661 (quoting *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015)). This is because, considering only the factual allegations in the complaint, it can be difficult to determine "'whether the facts of this case parallel a prior decision or not' for purposes of determining whether a right is clearly established." *Id.* at 660–61 (quoting *Guertin v. State*, 912 F.3d 907, 917 (6th Cir. 2019)). Nevertheless, a district court cannot defer a decision on qualified immunity merely because it must make the decision on a Rule 12 motion. *Myers v. City of Centerville*, 41 F.4th 746, 758–59 (6th Cir. 2022). Rather, because qualified immunity is a defense not just to liability but to having to litigate the suit itself, a district court must resolve the question as soon as possible. *Id.* at 758. Thus, "[a]lthough a defendant's 'entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12.'" *Moderwell*, 997 F.3d at 660 (quoting *Wesley*, 779 F.3d at 433–34).

---

have consistently noted, the fact that there is video evidence of an encounter does not permit us to overlook the Rule 12(c) standard of review in the name of "efficien[cy]." Dissenting Op, at 30. Instead, our precedent dictates that we may only consider the video when reviewing a Rule 12 motion to the extent that the video "blatantly contradict[s]" the allegations in the complaint. *Bell*, 37 F.4th at 364 (quoting *Scott*, 550 U.S. at 380). The dissent identifies no blatant contradictions between the video depiction of the events and the allegations in the complaint. Because the video is entirely consistent with the complaint, we may not review it at this stage.

### a. Constitutional Violation

Saalim alleges that Bretzloff used excessive force on him during the April 12, 2020 incident in five ways:  (1) when Bretzloff grabbed Saalim's left arm to pull him out of the car; (2) when Bretzloff "shoved" Saalim to the side of the cab; (3) when Bretzloff first applied the taser for nine seconds; (4) when Bretzloff applied the taser in drive-stun mode for seven seconds; and (5) when Bretzloff pushed Saalim to the ground when he had already been handcuffed. Compl., R. 1, Page ID #13–16.  At this stage, we conclude that Saalim has plausibly alleged facts in his complaint to show that these uses of force violated the Constitution.

When assessing the force used by an officer during the course of an arrest, we look to the Fourth Amendment.  *Godawa v. Byrd*, 798 F.3d 457, 463–64 (6th Cir. 2015).  "The Fourth Amendment's prohibition against unreasonable seizures protects citizens from excessive use of force by law enforcement officers."  *Palma*, 27 F.4th at 428 (quoting *Godawa*, 798 F.3d at 463). While "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," this use of force must be reasonable, which is judged by an objective standard.  *Graham v. Connor*, 490 U.S. 386, 396–97 (1989).  We do not assess the reasonableness of a use of force with "the 20/20 vision of hindsight," but instead look to "the perspective of a reasonable officer on the scene."  *Id.* at 396.

The Supreme Court in *Graham* articulated three factors that help determine whether an officer's use of force during an arrest or investigatory stop was reasonable:  "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* These factors are not exhaustive, but merely guide courts as they consider whether the officer's use of force was objectively reasonable under the "totality of the circumstances."  *Palma*, 27 F.4th at 428–29.

Defendants do not meaningfully contest that the first two *Graham* factors favor Saalim. Considering the first factor, the crime at issue for which he was stopped—a parking violation—is

not serious.**5**  As for the second factor, as Defendants admit, Saalim did not pose an immediate threat to Bretzloff's safety while he sat in the cab.  Moreover, when he exited the cab, he did not exhibit the type of agitated, violent behavior that this Court has previously recognized poses a threat to officer safety.  *See, e.g.*, *Kent v. Oakland Cnty.*, 810 F.3d 384, 391 (6th Cir. 2016) (acknowledging that this Court has previously found an immediate threat to officer safety when the suspect is "armed," is "particularly violent or physically resistant," or "attempted to hit officers or make a display of force"); *see also Shumate v. City of Adrian*, 44 F.4th 427, 444 (6th Cir. 2022) ("[M]ere 'agitated hand gestures' and profanity, unaccompanied by threats, fall short of the prototypical behavior that would make an officer fear for his physical safety." (citation omitted)).  Thus, we focus on the third *Graham* factor:  whether Saalim was actively resisting arrest.

When a suspect is actively resisting arrest, our caselaw instructs that police may use reasonable measures, including tasing the individual, to subdue him.  *Rudlaff v. Gillispie*, 791 F.3d 638, 641–42 (6th Cir. 2015).  By contrast, when the suspect does not actively resist arrest or has stopped resisting arrest, force will generally be unreasonable.  *Id.*; *see also Goodwin v. City of Painesville*, 781 F.3d 314, 323, 325 (6th Cir. 2015); *Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009).  "Active resistance has been found where 'some outward manifestation—either verbal or physical—on the part of the suspect had suggested volitional and conscious defiance.'" *Shumate*, 44 F.4th at 446 (quoting *Eldridge v. City of Warren*, 533 F. App'x 529, 534 (6th Cir. 2013)).  But "[i]f there is a common thread to be found in our caselaw on this issue, it is that noncompliance alone does not indicate active resistance."  *Id.* (alteration in original) (quoting *Eldridge*, 533 F. App'x at 535).

As an initial matter, this Court has held that when an officer has not told an individual that he is under arrest, this enhances the likelihood of a finding of excessive force.  *See id.* at 447 ("[Plaintiff] had not been told he was under arrest prior to being tased, so his resistance, if it was

---

**5**Saalim was also charged with menacing, but Bretzloff only told Saalim that he approached him because of a parking violation.  Additionally, although Saalim eventually pleaded guilty to a disorderly conduct charge, we have acknowledged that "[a] jury could conclude that disorderly conduct is not a 'serious' crime when determining whether an officer used excessive force in effecting the arrest for that crime." *Goodwin v. City of Painesville*, 781 F.3d 314, 322 (6th Cir. 2015); *see also Thacker v. Lawrence Cnty.*, 182 F. App'x 464, 472 (6th Cir. 2006) ("The crime of disorderly conduct is not a violent or serious crime.").

resistance at all, was merely passive, rendering unreasonable the first use of the Taser less than a minute after his arrival on the scene."); *Grawey*, 567 F.3d at 314 ("The general consensus among our cases is that officers cannot use force . . . on a detainee who . . . is not told he is under arrest, or is not resisting arrest."); *Adams v. Metiva*, 31 F.3d 375, 385 (6th Cir. 1994); *see also Osborn v. City of Columbus*, No. 22-3570, 2023 WL 2523307, at \*4 (6th Cir. Mar. 15, 2023). In this case, the complaint alleges that Bretzloff never told Saalim he was under arrest for any crime until Saalim was sitting on the ground while handcuffed. Indeed, the complaint does not reflect that Saalim even saw the handcuffs brandished by Bretzloff before he was tased, as Saalim's back was facing Bretzloff when he pulled out the handcuffs.

Defendants argue that, despite not being informed that he was under arrest until after handcuffs were placed on him, Saalim actively resisted Bretzloff's attempts to arrest him. A canvas of this circuit's active resistance caselaw illustrates why, at this stage, Defendants' arguments fail. We have previously found active resistance when plaintiffs were "out of control" and "forcefully . . . resist[ed] arrest," *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 511 (6th Cir. 2012); "highly intoxicated, volatile, and uncooperative," *Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 97 (6th Cir. 2012); or "moving around violently," *Foos v. City of Delaware*, 492 F. App'x 582, 585 (6th Cir. 2012). For example, in *Hagans*, this Court found that a plaintiff actively resisted arrest when he ran at an officer, pulled on the driver's side handle of another officer's police car, and refused to be handcuffed by lying "down on the pavement[,] . . . lock[ing] his arms tightly under his body, kicking his feet and continuing to scream." 695 F.3d at 507, 510–11. In *Caie*, the plaintiff threatened to fight police, asked them what he needed to do to have them shoot him, and, when the officers tried to physically restrain him, "began to run while flailing his arms violently." 485 F. App'x at 94. Finally, when the officers did have him on the ground, he hid his arms underneath his body so that they would not be able to handcuff him. *Id.* In *Foos*, the plaintiff rammed a truck into a concrete pillar and continued to press on the gas, "making the tires spin 'uncontrollably,' and rock[] back and forth violently," endangering the officers attempting to stop the plaintiff's behavior. 492 F. App'x at 584–86, 590–91. Accordingly, this Court has found that officers who used force in the course of arrests in these situations did not violate the plaintiffs' constitutional rights or did not violate plaintiffs' clearly established rights, entitling them to qualified immunity.

By contrast, when individuals behave nonviolently and are merely noncompliant, this Court has found that they are only passively resisting arrest, which weighs against the reasonableness of a use of force. For example, in *Shumate*, this Court found that an individual only passively resisted arrest when he was not told he was under arrest, lay prone on the ground while the officer kicked him, and repeatedly verbally complied, such as telling the officer "okay," and "I'm not resisting." 44 F.4th at 447–49. Despite the fact that the plaintiff gave the officer the middle finger and yelled an expletive at him, and despite the fact that the plaintiff pulled his hands away rather than present them for handcuffing, we held that these actions constituted only non-threatening verbal resistance[6] and physical noncompliance, rather than active resistance. *Id.* at 435, 447–49. In *Kent*, this Court similarly found passive resistance when a plaintiff admitted that he did not comply with officers' orders to calm down, and told officers "[g]o ahead and Taze me, then," because this did not constitute a "direct threat of physical harm" to the officers, and it did "not resemble the 'continued resistance and hostility' often present in our active resistance cases." 810 F.3d at 393–94 (citation omitted); *see also Goodwin*, 781 F.3d at 323–24 (finding no active resistance when plaintiff told officers he would not come out of the house, refused to physically exit the house, and did not present his arms for handcuffing while actively being tased because he had no control over his body); *Eldridge*, 533 F. App'x 531–33 (finding that a driver's refusal to exit a car, without more and even when directed by an officer to do so, did not constitute active resistance).

Defendants acknowledge that Saalim's behavior did not approach the type of violent behavior that the officers in *Hagans*, *Caie*, and *Foos* confronted. Despite this concession, Defendants nevertheless argue that he actively resisted in two instances: first, by failing to get out of the cab and, second, by attempting to move his hands away while being handcuffed, purportedly by turning around to face Bretzloff. As to the first charge of active resistance, we have held that, without other acts of defiance, "failure to exit a vehicle is not active resistance and does not justify the use of a taser." *Browning v. Edmonson Cnty.*, 18 F.4th 516, 527 (6th Cir.

---

[6]To be sure, a "verbal showing of hostility" can constitute active resistance. *Shumate*, 44 F.4th at 447 (quoting *Eldridge*, 533 F. App'x at 535). But, in *Shumate*, we found that "Shumate's verbal jabs and rude hand gestures were not threatening in a manner that would amount to active resistance absent something more, such as overtly threatening language." *Id.* at 448.

2021) (citing *Eldridge*, 533 F. App'x at 535). Moreover, the complaint alleges that Bretzloff never asked Saalim to get out of the car before he put his hands on Saalim's left arm. Saalim could not have been actively resisting a command he was never given, or given insufficient time in which to comply. *See Smith v. City of Troy*, 874 F.3d 938, 946 (6th Cir. 2017) (finding excessive force when a plaintiff did not have sufficient time to comply with an order from an officer).

Defendants primarily focus on the second allegation of active resistance: that Saalim actively resisted arrest by turning around to face Bretzloff while Bretzloff attempted to handcuff him. However, we have found passive, not active, resistance when suspects do not readily present their hands for handcuffing, or even when suspects move their arms slightly while officers are attempting to handcuff them or otherwise gain control of them. For example, in *Shumate*, despite the plaintiff's pulling his arms away from an officer when the officer attempted to handcuff him, the Court found that this action alone, without "other acts of defiance," constituted passive resistance. 44 F.4th at 447 (quoting *Rudlaff*, 791 F.3d at 641). The Court held that this was particularly true when the plaintiff had not been told he was under arrest. *Id.*; *see also LaPlante v. City of Battle Creek*, 30 F.4th 572, 580 (6th Cir. 2022) (finding a genuine dispute of material fact as to whether plaintiff actively resisted arrest when he was not told he was under arrest and when, although plaintiff "moved his hands in the air just as [the officer] was about to handcuff him," it was unclear whether he was surrendering or resisting); *Wright v. City of Euclid*, 962 F.3d 852, 861, 867 (6th Cir. 2020) (finding genuine dispute of material fact as to whether an individual who moved his hand out of officer's grip when officer was handcuffing him constituted active resistance); *King v. City of Rockford*, No. 22-2038, 2024 WL 1321259, at *8 (6th Cir. Mar. 28, 2024) (published opinion) (finding that a reasonable juror could find no active resistance when, although a plaintiff was "'argumentative' and noncompliant," and depicted on video "turning his body away from" the officer, he was not "physically hostile" and did not use force against the officer); *Smith*, 874 F.3d at 945 ("A reasonable juror could conclude that, in pulling his arm away, [plaintiff's] resistance was minimal and that [the officer's] response in taking [the plaintiff] to the ground was excessive."); *Rudlaff*, 791 F.3d at 641 ("[Active resistance] includes refusing to move your hands for the police to handcuff you, *at least if that inaction is coupled with other acts of defiance*.") (emphasis added); *Osborn*,

2023 WL 2523307, at *1, *5 (describing that an individual pulling their hand away from an officer attempting to detain them "could be considered minimal, passive resistance that cannot justify the [o]fficers' uses of force").

By contrast, when this Court has found that moving hands away to avoid being handcuffed constitutes active resistance, there have been other indicia of resistance that are not present in this case. Additionally, individuals in those cases have taken far more pronounced steps to avoid being handcuffed than just turning around. Defendants rely primarily on this Court's recent decision in *Bell*, which they argue stands for the proposition that moving hands away from handcuffs, alone, can constitute active resistance. 37 F.4th 362. *Bell* cited "indisputable video evidence" that showed the plaintiff "*repeatedly* pull[ing] his left arm away from [the officer] to avoid the handcuff (even after officers warned that he would be tased if he didn't comply)." *Id.* at 368 (emphasis added). And this video evidence also showed that, before the plaintiff pulled his arm away from the officer, he had been "wrestled . . . to the pavement," one officer was lying on top of him, and he still refused to give the officers his hands for handcuffing. *Id.* at 365, 368. Moreover, the plaintiff in *Bell* moved his arm away from the officer "several times," and neither of the two officers on either side of him—let alone the officer lying on top of him—could "get control over either of [his] arms" before he was tased. *Id.* at 368. Defendants attempt to argue that Saalim's mere turning to face Bretzloff constituted the same level of active resistance as in *Bell*, in which the plaintiff repeatedly pulled his arms away from officers and refused to allow officers to gain control of his arms. By contrast, *Bell* merely represents a commonsense application of our long-standing caselaw on active resistance, by finding that an individual who had been wrestled to the ground and continued to pull his arms away from police actively resisted arrest by refusing to be handcuffed.

Defendants also claim that our decisions in *Hagans*, *Caie*, and *Foos* support finding active resistance here. To be sure, in both *Hagans* and *Caie*,[7] this Court referenced the plaintiffs' failure to present their hands for handcuffing as a factor contributing to a finding of active

---

[7]Defendants' reference to *Foos* is inapposite because it did not involve a suspect avoiding being handcuffed. Instead, as previously described, it involved officers using force to subdue an individual who had crashed into a pillar and was continuing to accelerate, making his wheels spin dangerously out of control. *Foos*, 492 F. App'x at 584–86, 590.

resistance. *See Hagans*, 695 F.3d at 507, 509 ("Hagans refused to be handcuffed. He lay down on the pavement and locked his arms tightly under his body, kicking his feet and continuing to scream."); *Caie*, 485 F. App'x at 96 ("Even after officers successfully subdued Plaintiff by taking him to the ground, he remained uncooperative, pulling his arms underneath his body and refusing to allow the officers to handcuff him."). However, in both cases, as in *Bell*, the plaintiffs took far more drastic measures to avoid being handcuffed—*e.g.*, actively hiding their hands from the officers—than any plausible reading of Saalim's complaint would indicate. Further, the erratic and dangerous behavior of both plaintiffs in *Hagans* and *Caie* prior to being handcuffed contributed to the reasonableness of the uses of force. *See Hagans*, 695 F.3d at 507; *Caie*, 485 F. App'x at 96.

The facts alleged in Saalim's complaint paint the following picture. After an approximately 30 second interaction in which Saalim did not produce his driver's license when requested, Bretzloff—without first asking Saalim to exit the vehicle and giving him time to comply—opened the cab's door and attempted to force him out of the cab by grabbing Saalim's arm. Another 30 seconds later, Saalim exited the cab, and Bretzloff "shoved" him against the side of the cab. Compl., R. 1, Page ID #14. Then, Saalim turned to speak to Bretzloff. A few seconds later, while Saalim was facing the cab and his back was to Bretzloff, Bretzloff pulled out handcuffs. Saalim then turned around to face Bretzloff again, and stood against the cab "with both hands visible and empty," at which point Bretzloff tased him. *Id.* at Page ID #15. Approximately eight seconds later, Bretzloff tased Saalim again. As illustrated by the cases above, Saalim's mere turning to face Bretzloff does not indicate active resistance to being handcuffed. The complaint does not allege that he jerked his hands away or that he hid his hands to try and avoid being handcuffed. To the contrary, it alleges that the moment before he was tased, Saalim had both of his hands visible and empty. And it does not contain other indicia of active resistance.[8]

---

[8]Contrary to the dissent's unsupported speculation that "Saalim was never going to give Deputy Bretzloff his driver's license," the video does not show that Saalim actively resisted arrest any more than his complaint conveys. Dissenting Op., at 28. Instead, the video emphasizes that Bretzloff gave Saalim insufficient time to comply with commands, and clearly depicts that, the moment before Bretzloff tased Saalim, Saalim stood calmly in front of Bretzloff with his hands clearly visible and empty. Based on our precedent described above, no reasonable officer could have believed that Saalim's questions and movements as depicted on the video constituted active

Considering the totality of the circumstances, and the application of all three *Graham* factors, the use of force against Saalim was unreasonable. First, Saalim had not been stopped for a severe crime. Second, he did not pose an immediate threat to Bretzloff's safety. And third, as discussed above, he did not actively resist arrest at any point in the interaction. When none of the *Graham* factors weigh against the plaintiff, we have found an officer's use of force in similar situations violates the Fourth Amendment. For example, we have held that "[w]hen a suspect actively resists arrest, the police can use a [t]aser . . . to subdue him; but when a suspect does not resist[] or has stopped resisting, they cannot." *Shumate*, 44 F.4th at 446 (last alteration in original) (quoting *Rudlaff*, 791 F.3d at 642)). Similarly, as to Saalim's charge that Bretzloff pushed him to the ground when he was already handcuffed, "it is clearly established in this circuit that 'the gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional.'" *Harris v. City of Circleville*, 583 F.3d 356, 367 (6th Cir. 2009) (quoting *Bultema v. Benzie Cnty.*, 146 F. App'x 28, 35 (6th Cir. 2005)). And, as to Saalim's charges of force before the tasing, we have held that "a jury could reasonably find that slamming an arrestee into a vehicle constitutes excessive force when the offense is non-violent, the arrestee posed no immediate safety threat, and the arrestee had not attempted to escape and was not actively resisting." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 253–54 (6th Cir. 2010); *see also Solovy v. Morabito*, 375 F. App'x 521, 525–26 (6th Cir. 2010) ("[The plaintiff] posed no apparent safety risk to the public or to the police, and [the officer's] use of violent force to remove [the plaintiff] from his vehicle was gratuitous and therefore unreasonable."). Therefore, based on the facts as alleged in Saalim's complaint, each use of force was unreasonable and violated the Fourth Amendment.

**b. Clearly Established Right**

Having shown that Bretzloff's conduct, as alleged in the complaint, violated the Fourth Amendment, Saalim must also show that this violation was clearly established. That is, he must show that "the contours of" the right were "sufficiently clear" such "that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*,

---

resistance to arrest. And contrary to the dissent's conclusion, our view of the same video shows that, at a later stage of the litigation, a reasonable juror could conclude that Saalim was compliant, or, at a minimum, only passively resisted arrest.

563 U.S. 731, 741 (2011) (cleaned up). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). The plaintiff need not identify "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

As the Supreme Court has "repeatedly stressed[,] . . . courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Wesby*, 583 U.S. at 63–64 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Id.* at 64 (alteration in original) (quoting *Anderson*, 483 U.S. at 641). Nevertheless, "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).

As an initial matter of timing, the constitutional right must be clearly established at the time that the officer used the force, meaning the law needed to be clearly established as of April 2020, the time of Saalim's arrest. This Court has held that "by 2019, . . . the right to be free from physical force when one is not actively resisting the police was clearly established." *Shumate*, 44 F.4th at 450. And, even more specifically, by 2020, when Bretzloff tased Saalim, "it was clearly established in this circuit that an individual has a constitutional right not to be tased when he or she is not actively resisting." *Browning*, 18 F.4th at 525. Because Saalim was not actively resisting arrest, his right to be free from tasing and physical force was clearly established in April 2020. Accordingly, Bretzloff is not entitled to qualified immunity at this stage of the litigation, and the district court erred in concluding that he was.

### 3. Section 1983 Fourteenth Amendment Claim

The district court dismissed Saalim's § 1983 Fourteenth Amendment claim because it found that it was identical to his Fourth Amendment claim. When bringing an excessive force claim relating to an arrest, the Fourth Amendment, rather than the "more generalized notion of

'substantive due process'" governs. *Graham*, 490 U.S. at 395. On appeal, Saalim argues that the district court erred in finding that his Fourteenth Amendment claim was part and parcel of his Fourth Amendment claim because he is also pursuing an equal protection claim based on race and ethnicity. But his pleadings and briefs in the district court belie this argument. Count One of his complaint, encompassing his § 1983 claims under the Fourth and Fourteenth Amendments, only references Bretzloff's use of excessive force. Moreover, his brief in response to the Lucas County Defendants' second motion for judgment on the pleadings refers to his "Fourth and Fourteenth Amendment" claims under § 1983, but only cites to cases discussing the use of excessive force. Pl.'s Br., R. 48, Page ID #358–66.

On appeal, Saalim argues that he sufficiently pleaded a Fourteenth Amendment equal protection claim because "[w]hether racial and/or ethnic bias was a factor in this incident is a genuine issue of material fact as Saalim is [an] African American male who emigrated from Somalia in 1993, [and] both Bretzloff and [the Walmart employee who approached him] are white." Pl.'s Br., ECF No. 22, 36 n.3. Although the complaint alleges that Saalim is an immigrant from Somalia, it never indicates his race, or the race or ethnicity of Bretzloff and the Walmart employee. Even if it did, this allegation alone is not enough. *See Nali v. Ekman*, 355 F. App'x 909, 913 (6th Cir. 2009) ("The fact that 'defendants are caucasian' and that [the plaintiff] 'is non-caucasian' does not by itself show that defendants were motivated to discriminate against him on the basis of his race or ethnicity.").

Saalim further argues that the complaint alleged an equal protection violation because it alleged that the Sheriff's Office "had not become certified in relevant policies concerning the use of force and non-discriminatory recruiting and hiring policies at the time of the incident." Pl.'s Br., ECF No. 22, 36 n.3. He cites no authority to show that a single reference to a failure to adopt a general use of force policy and a general non-discriminatory hiring policy could state a claim for a violation of the Equal Protection Clause. And our precedent generally requires more. *See, e.g.*, *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) ("To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'" (citation

omitted)). Accordingly, the district court did not err in dismissing the Fourteenth Amendment claim.

### 4. State Law Claims

#### a. Assault and Battery

Defendants argue that Saalim's Ohio assault and battery claims are barred by the one-year statute of limitations applicable to such actions. *See* Ohio Rev. Code § 2305.111(B). The alleged assault and battery took place on April 12, 2020, and Saalim filed his complaint on July 29, 2021, over three months past the one-year statute of limitations. Thus, without any applicable tolling rules, Saalim's assault and battery claims are barred by his untimely filing.

Recognizing this deficiency, Saalim argues that his claims were tolled by an Ohio house bill, which tolled the statute of limitations for state claims from March 9, 2020, to July 30, 2020, because of the COVID-19 pandemic. Saalim claims that this bill tolled any claims that accrued during this time, and that the statute of limitations accordingly did not begin to run until July 30, 2020, making his claims timely. By contrast, Defendants argue that the bill only tolled claims that would have expired during this time. Because Saalim's claims would not have expired during this tolling period, Defendants argue that Saalim cannot benefit from tolling, and thus, his claims are time barred.

Therefore, the question before us is whether the Ohio house bill tolls claims that merely would have expired during the identified period, or whether it also tolls claims that accrued during this period. The Ohio house bill, enacted into law on March 27, 2020, states:

> The following that are set to expire between March 9, 2020, and July 30, 2020, shall be tolled:
>
> (1) A statute of limitation, as follows: . . .
>
> (b) When a civil cause of action accrues against a person, notwithstanding any other provision of law to the contrary, the period of limitation for commencement of the action . . . .

2020 Am. Sub. H.B. No. 197 § 22 (Mar. 27, 2020), https://publicfiles.ohiosos .gov/free/publications/SessionLaws/133/133-HB-197.pdf.

By its text, the Ohio house bill applies to toll statute of limitations "set to expire" during the tolling period. 2020 Am. Sub. H.B. No. 197 § 22. In the section discussing civil causes of action, it specifies that the act tolls the statute of limitations when "the period of limitation for commencement of the action" is set to expire during the tolling period. *Id.* § 22(A)(1)(b). Although the introductory clause of subsection (b) uses the phrase "[w]hen a civil cause of action accrues," this language merely identifies that subsection (b) addresses civil actions, whereas subsections (a) and (c) address criminal cases and administrative actions, respectively. *Id.* § 22(A)(1)(a), (c).

Moreover, Ohio state courts have interpreted the house bill and a similar Supreme Court administrative action[9] to toll only claims that have statutes of limitations that would "expire" during the tolling period. *See, e.g.*, *State v. Jones*, 2022-Ohio-3864, 2022 WL 16545625, at *2 (Ohio Ct. App. Oct. 31, 2022) ("The language of both House Bill 197 and the Ohio Supreme Court's tolling order makes clear that the order applied only to time requirements, time limitations, and deadlines that were set to expire between March 9, 2020, and July 30, 2020."); *Johnson v. Ohio Dep't of Rehab. & Correction*, 2022-Ohio-2155, 2022 WL 2286218, at *2 (Ohio Ct. App. June 23, 2022) ("Thus, the tolling legislation tolled deadlines between March 9 and July 30, 2020, but had no effect on time requirements which expired after July 30, 2020."). Although the Ohio Supreme Court has not explicitly stated that H.B. 197 does not apply to claims that accrued during the tolling period, the cases from the Ohio Court of Appeals that have are instructive, absent indication that the Ohio Supreme Court would rule otherwise.[10] *See Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014).

Although Saalim cites two cases that he claims support his position, both are entirely consistent with the above understanding of H.B. 197—that is, the bill only tolls claims that

---

[9]On the same day as the Ohio house bill, the Ohio Supreme Court issued an order, similarly tolling time limits imposed by the rules of Ohio courts, stating that, "[t]he time requirements imposed by the rules of the Court and set to expire during the term of this order shall be tolled." *In re Tolling of Time Requirements Imposed by Rules Promulgated by Supreme Ct. & Use of Tech.*, 141 N.E.3d 974, 975 (Ohio 2020) (table decision).

[10]Not only is there no indication that the Ohio Supreme Court would rule otherwise, but it has put forward guidance on H.B. 197 that accords with Defendants' interpretation. For example, the guidance explicitly states: "Am. Sub. H.B. 197 tolls only those time requirements that are set to expire during the emergency period." *Tolling Legislation and Court Orders/Frequently Asked Questions*, The Supreme Court of Ohio and the Ohio Judicial System, https://www.supremecourt.ohio.gov/tolling/.

would have expired during the tolling period. *See, e.g.*, *Chapman Enterprises, Inc. v. McClain*, 179 N.E.3d 1201, 1204–05 (Ohio 2021) (tolling a deadline that would have expired during the tolling period); *Roach v. Vapor Station Columbus, Inc.*, 2022-Ohio-2106, 2022 WL 2211529, at *2 (Ohio Ct. App. June 21, 2022) (same). The Ohio bill on which Saalim relies says what it means: it only tolls claims that would have expired during the statute of limitations period. And Ohio courts have interpreted the bill by its plain language to mean the same. Because Saalim's statute of limitations did not expire during the tolling period, and because he filed his complaint outside of the one-year statute of limitations applicable to assault and battery claims, these claims are barred.

Saalim alternatively argues that he is entitled to equitable tolling of his assault and battery claims because "during the extraordinary circumstances presented by the COVID-19 pandemic, Appellant reasonably relied upon a plain reading of the tolling order to determine when he needed to file his Complaint." Pl.'s Br., ECF No. 22, 62 (emphasis omitted). This Court applies state equitable tolling doctrine to claims arising from state law. *Roberson v. Macnicol*, 698 F. App'x 248, 250 (6th Cir. 2017); *see also Osborn v. Griffin*, 865 F.3d 417, 438 (6th Cir. 2017) (applying Kentucky equitable tolling to state law claim). In Ohio, "equitable tolling is to be applied sparingly and only in exceptional circumstances." *McCualsky v. Appalachian Behav. Healthcare*, 100 N.E.3d 1049, 1055 (Ohio Ct. App 2017). Generally, these extraordinary circumstances apply to "parties who were prevented from complying with [statutory deadlines] through no fault or lack of diligence of their own." *Strother v. Columbus*, 200 N.E.3d 1265, 1275 (Ohio Ct. App. 2022) (citation omitted). For example, "[t]he doctrine is generally limited to circumstances in which a litigant is intentionally misled or tricked into missing the filing deadline." *Roach*, 2022 WL 2211529, at *2.

Any delay in filing Saalim's complaint was a result of misreading the house bill, not because of any action out of his control or any actions taken by Defendants. That the Ohio opinions interpreting the house bill came out after Saalim filed his complaint makes no difference because the clear text of the house bill applied only to claims that would have "expire[d]" during the tolling period. 2020 Am. Sub. H.B. No. 197 § 22. Thus, we decline to find that any extraordinary circumstance prevented him from timely filing his complaint, and we

decline to equitably toll his statute of limitations. *See*, *e.g.*, *Roach*, 2022 WL 2211529, at *3 (declining to equitably toll a plaintiff's claims when the delay resulted only from the plaintiff's misreading of H.B. No. 197).

### b. Intentional Infliction of Emotional Distress

Defendants also argue that Saalim's claims for intentional infliction of emotional distress ("IIED") are barred by the statute of limitations. Generally, Ohio IIED claims are subject to a four-year statute of limitations. *Yeager v. Loc. Union 20*, 453 N.E.2d 666, 672 (Ohio 1983), *abrogated on other grounds by Welling v. Weinfeld*, 866 N.E.2d 1051 (Ohio 2007). However, the Ohio Supreme Court has said that "[w]here the essential character of an alleged tort is an intentional, offensive touching, the statute of limitations for assault and battery governs even if the touching is pled as" another action, such as IIED. *Doe v. First United Methodist Church*, 629 N.E.2d 402, 407 (Ohio 1994), *abrogated on other grounds by statute, as recognized by Pratte v. Stewart*, 929 N.E.2d 415, 419, 425 (Ohio 2010) (alteration in original) (citation omitted). Defendants argue that, as pleaded in his complaint, Saalim's IIED claim shares the same essential character as his assault, battery, false arrest, and false imprisonment claims, which all have a one-year statute of limitations. Ohio Rev. Code §§ 2305.11(A), 2305.111. Accordingly, they argue that his IIED claim is similarly subjected to a one-year statute of limitations.

Saalim argues that his IIED claim encompasses more than just the alleged assault and battery. He claims that it also encompasses the power disparity between him and Bretzloff and the claim that racial or ethnic bias was a factor in the incident.[11] He also argues that his IIED claim encompasses Bretzloff's "crude, hot-tempered, threatening, and dismissive treatment of Saalim," because these actions constituted extreme and outrageous behavior. Pl.'s Br., ECF No. 22, 65. Saalim cites no cases that have similarly held these additional facts can transform the "essential character" of a claim that is, at base, premised on an intentional touching. More importantly, his complaint does not allege these facts as the basis for his IIED claim. Instead, it alleges the following facts form the basis of this claim: "Bretzloff's conduct directed toward

---

[11]As stated above, Saalim's complaint does not sufficiently allege any racial or ethnic bias. Thus, this cannot serve as the basis for his IIED claim.

Saalim, including, but not limited to, the use of excessive force, assault, battery, false arrest, false imprisonment, and the deprivation of Saalim's Fourth and Fourteenth Amendment rights." Compl., R. 1, Page ID #33.

By contrast, caselaw supports finding that the statutes of limitations for the other state law claims apply and bar Saalim's IIED claim. First, the Ohio Supreme Court has previously found an intentional touching to be the "essential character" of a negligence claim by a plaintiff against an arresting officer. *See Love v. City of Port Clinton*, 524 N.E.2d 166, 167–68 (Ohio 1988). Thus, the fact that Bretzloff, as a police officer, had more authority in the situation does not change the essential character of Saalim's IIED claim. And, although we appear to lack authority addressing this specific issue, multiple district court cases from this circuit have applied Ohio law and concluded, on similar facts, that the one-year statute of limitations applied to IIED claims. For example, in *Freeman v. City of Lyndhurst*, the plaintiff challenged his arrest and raised an IIED claim that purported to challenge "the 'emotional trauma,' 'humiliation' and 'embarrassment' arising from his being subject to an unlawful seizure." No. 1:09 CV 2006, 2010 WL 908171, at *2 (N.D. Ohio Mar. 12, 2010). The district court concluded that plaintiff's IIED claim shared an "essential character" with his assault and battery, despite plaintiff's arguments, because the claim was ultimately premised on plaintiff's claims of excessive force and unlawful seizure. *Id.* at *3; *see also Lee v. City of Norwalk*, No. 3:11 CV 897, 2011 WL 4007786, at *1–2 (N.D. Ohio Aug. 25, 2011), *report and recommendation adopted*, No. 3:11 CV 897, 2011 WL 4007785 (N.D. Ohio Sept. 9, 2011) (finding IIED claim subject to one-year statute of limitations when plaintiff alleged injury from overtight handcuffs, being choked and thrown onto a table, denial of her medical inhaler, and being barred from using the bathroom while detained by police, all of which underlaid her assault and battery claim).

Similarly, in this case, Saalim's only allegations relating to his IIED claim stem from the alleged assault, battery, false imprisonment, and false arrest by Bretzloff, meaning that it shares the same essential character. Thus, his IIED claim is subjected to the same one-year statute of limitations. Because Saalim filed his complaint outside of that year, the district court did not err by dismissing this claim as time barred.

**c. False Arrest and Imprisonment**

Defendants also argue that Saalim's claims of false arrest and imprisonment are barred because he pleaded no contest to an offense—disorderly conduct—stemming from the incident. Indeed, Saalim does not dispute that this Court has previously held that "[u]nder Ohio law, '[a] guilty finding in a criminal proceeding, whether by trial or plea, constitutes an absolute defense to an action for false arrest or false imprisonment.'" *Walker v. Schaeffer*, 854 F.2d 138, 143 n.1 (6th Cir. 1988) (second alteration in original) (citation omitted) (finding that a no contest plea barred a § 1983 action based on false arrest and imprisonment); *see also Ryan v. Conover*, 18 N.E.2d 277, 280 (Ohio Ct. App. 1938); *Jackim v. Sam's E., Inc.*, 378 F. App'x 556, 561 (6th Cir. 2010).

Instead, Saalim argues that two exceptions to this general rule apply. First, he argues that this Court has previously acknowledged that "[g]iving preclusive effect to state court judgments is . . . inappropriate 'where the party against whom an earlier court decision is asserted did not have a full and fair opportunity to litigate the claim or issue decided by the first court.'" *Vinson v. Campbell Cnty. Fiscal Ct.*, 820 F.2d 194, 197 (6th Cir. 1987) (quoting *Allen v. McCurry*, 449 U.S. 90, 101 (1980)). Saalim argues that holding him to his no contest plea "ignore[s] the reality of plea bargaining in our criminal justice system" because "[f]or many limited means defendants," deciding whether to take a plea is "not based on whether the prosecution can prove its case beyond a reasonable doubt," but, instead is often based on "financial necessity." Pl.'s Br., ECF No. 22, 58. But this argument about how plea bargaining can impact a wide swath of defendants does not say anything about whether Saalim himself had a "full and fair opportunity to litigate" his claim. *Vinson*, 820 F.2d at 197. Moreover, we have, in an unpublished case, previously indicated that we would reject an attempt to claim that a procedural irregularity, even in a plaintiff's own plea bargaining process, could excuse preclusion of a false arrest or imprisonment claim. *See Jackim*, 378 F. App'x at 561–62 (finding a plaintiff's similar argument waived, but nevertheless acknowledging that she "had the option of insisting upon a trial where her acquittal would have cleared the way for this lawsuit"). Thus, Saalim's failure to point to any deficiencies in his own plea bargaining process means that he has not shown he lacked a full and fair opportunity to litigate his case.

Second, Saalim notes that the Supreme Court has recognized that affording a preclusive effect to state court judgments may not be proper when "'controlling facts or legal principles have changed significantly since the state-court judgment,' or when 'special circumstances warrant an exception to the normal rules of preclusion.'" *Haring v. Prosise*, 462 U.S. 306, 313 n.7 (1983) (citations omitted). He argues that the Internal Affairs Bureau's investigation, which began after Saalim entered his plea, could have helped him in securing a dismissal of the claims against him, and, therefore, constitutes a "special circumstance." He cites no authority to support this position. And the mere chance that his claims could have been dismissed do not resemble the same types of special circumstances—such as overriding public policy concerns or procedural irregularities between the two proceedings—that we and the Supreme Court have previously found would make it improper to enforce a state-court judgment. *See, e.g.*, *Montana v. United States*, 440 U.S. 147, 164 n.11 (1979) ("Redetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation."); *Westwood Chem. Co. v. Kulick*, 656 F.2d 1224, 1232 (6th Cir. 1981) ("The public policy and manifest injustice to a party exceptions to applying the doctrine of res judicata have been recognized sparingly and only under the most urgent circumstances."); *see generally United States v. Stauffer Chem. Co.*, 684 F.2d 1174, 1190–91 (6th Cir. 1982) (Jones, J., concurring) (collecting cases). Accordingly, because his false arrest and imprisonment claims are barred by his no contest plea to disorderly conduct, the district court did not err in dismissing them.[12]

### d. Punitive Damages

Finally, Saalim's complaint contained an independent cause of action titled "Punitive Damages." Compl., R. 1, Page ID #36. The district court dismissed this as a separate claim, correctly noting that punitive damages are not independent grounds for relief in Ohio. *See Whetstone v. Binner*, 57 N.E.3d 1111, 1115 (Ohio 2016). Because Saalim had improperly asserted this claim as an individual count in his complaint, the district court properly dismissed this count.

---

[12]The Lucas County Defendants argue on appeal that Saalim's false arrest and imprisonment claims can be dismissed because they are also subject to a one-year statute of limitations. But they did not raise this argument in the district court, and, accordingly, have not preserved it for appeal. *United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009).

**5. Dismissal of Other Defendants**

Saalim also alleged a number of derivative claims against Defendants other than Bretzloff. Specifically, he asserted a claim under § 1983 for municipal liability against Sheriff Navarre, as well as state law claims for negligent hiring, supervision, training, and retention, and vicarious liability against the Walmart Defendants and McNett. The district court found that these Defendants could only be liable on each of these claims if Bretzloff was found liable for either the federal or state law claims asserted against him. Thus, because the district court dismissed the claims against Bretzloff in their entirety, it dismissed the derivative claims against all other Defendants as well.

In the district court and on appeal, the parties have not offered any arguments on the merits of these derivative claims. Rather, all parties continue to argue that the derivative claims rise or fall based on Bretzloff's underlying liability. Because we now find that the district court's dismissal of Saalim's § 1983 Fourth Amendment claim was in error, we likewise reverse and remand the dismissal of the derivative claims against the other Defendants for consideration of the merits of those claims in the first instance, consistent with our previous holdings.[13] *See, e.g.*, *Hicks v. Scott*, 958 F.3d 421, 440 (6th Cir. 2020) (reversing on underlying constitutional claim and remanding derivative claims against other defendants for the district court to consider in the first instance).

---

[13]On appeal, the Walmart Defendants contend that the claims against them should be dismissed if the state law claims against Bretzloff are also dismissed. Ohio law requires that an employee be "liable for a tort" or "guilty of a claimed wrong" against an individual before finding the employer liable for vicarious liability or negligent hiring. *Strock v. Pressnell*, 527 N.E.2d 1235, 1244 (Ohio 1988). It does not explicitly identify that this tort or claimed wrong must be a violation of an Ohio statute. And, although it is axiomatic that claims brought under § 1983, even against private parties, cannot be premised on a theory of *respondeat superior*, *Savoie v. Martin*, 673 F.3d 488, 494 (6th Cir. 2012), Saalim brings these claims under Ohio law, not § 1983. *Cf. S.L. ex rel. K.L. v. Pierce Twp. Bd. of Trustees*, 771 F.3d 956, 963 (6th Cir. 2014) (dismissing an Ohio negligent supervision claim because plaintiff could not show underlying § 1983 constitutional violation that served as the basis for state law negligence claim); *Gomez v. Galman*, 18 F.4th 769, 780–81 (5th Cir. 2021) (reversing a dismissal of a Louisiana state law negligent hiring claim while affirming dismissal of *Monell* liability claim because the tests for the two claims were different). Thus, consistent with the treatment of Sheriff Navarre, we will remand the claims against the Walmart Defendants and McNett for consideration by the district court in the first instance.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's dismissal of Saalim's state law claims of assault, battery, intentional infliction of emotional distress, false arrest, and false imprisonment. Punitive damages may be pursued, but not as an independent cause of action. We similarly **AFFIRM** the dismissal of his Fourteenth Amendment claim under § 1983. However, we **REVERSE** the grant of qualified immunity and dismissal of Saalim's Fourth Amendment claim under § 1983 against Bretzloff; his § 1983 municipal liability claim against Sheriff Navarre; and his state law claims of negligent hiring, supervision, training, and retention and vicarious liability against the Walmart Defendants and McNett. We **REMAND** for proceedings consistent with this opinion.

—————————————————

**CONCURRENCE / DISSENT**

—————————————————

ALICE M. BATCHELDER, Circuit Judge, concurring in part and dissenting in part.  The majority finds that the district court erred by considering Deputy Bretzloff's body-cam video, and consequently reverses the grant of qualified immunity on the excessive-force claim and reinstates the claims derivative thereto.  I respectfully disagree with this analysis and judgment. I would affirm the district court in its entirety and, therefore, I concur in all other respects.

To cut to the chase: based on Saalim's conduct during the encounter—on full display in the video from Deputy Bretzloff's body cam—Saalim was never going to give Deputy Bretzloff his driver's license, nor was he going to submit voluntarily to handcuffing.  From beginning to end, Saalim was intent on obstructing justice—initially by obstructing Deputy Bretzloff from investigating his parking in the no-parking zone (and his refusing the Walmart employee's demand that he move) and then by obstructing arrest and restraint.  The only way that Deputy Bretzloff was going to obtain Saalim's license was to take it by some manner of physical force. Saalim's conduct in the video leaves me with no doubt about this.  But even if I am mistaken— or rather, if Deputy Bretzloff was mistaken in his heat-of-the-moment determination—this is not a wholly unreasonable conclusion or inference to draw from the totality of Saalim's conduct.

Qualified immunity allows police officers "breathing room to make reasonable but mistaken judgments," and "protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (quotation marks and citation omitted). "This accommodation for reasonable error exists because officials should not err always on the side of caution because they fear being sued." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quotation marks and citations omitted).  Thus, the fundamental question is whether Deputy Bretzloff's actions were wholly unreasonable, plainly incompetent, or intentionally illegal.

Similarly, the excessive-force inquiry uses "the Fourth Amendment's reasonableness standard," which "requires analyzing the totality of the circumstances." *Plumhoff v. Rickard*, 572 U.S. 765, 774-75 (2014) (quotation marks and citation omitted) (relying on *Graham v.*

*Connor*, 490 U.S. 386, 396 (1989) (explaining that objective reasonableness "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests [i.e., the amount of force] against the countervailing governmental interests at stake [i.e., the need for force]")).  In this analysis, we must "allow for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id.* at 775.

And, in this case, the parties, the district court, and this panel have readily available for review an undisputed and indisputable video recording of exactly what happened.  The raw video from Deputy Bretzloff's body cam, which captured the entire encounter, is admissible—and admitted—record evidence.  In fact, Saalim's complaint expressly relies on that video, citing to it extensively.  Thus, the district court (and now this panel) was left simply to decide whether "the events recorded on the tape justified the officers' conduct."  *Plumhoff*, 572 U.S. at 775.

In *Shumate v. City of Adrian*, 44 F.4th 427 (6th Cir. 2022), we were confronted with roughly analogous circumstances.  Our reasonableness analysis was succinct and direct:

> To start, taken in the light most favorable to Shumate, a reasonable officer faced with the same circumstances could not have determined that Shumate's actions bore the hallmarks of active resistance.  A reasonable jury could conclude that Shumate's physical behavior (lying prone) indicated submission and that his verbal statements (saying 'okay,' 'I'm not resisting,' and 'I'll turn over, don't f[**]ing shoot me again with that thing') indicated compliance.

*Id.* at 447 (quotation marks and citation omitted).  By deconstructing that passage into the underlying test for the totality-of-the-circumstances reasonableness inquiry (with some degree of deference to the officer's heat-of-the-moment decision-making), we have two questions:

> (1) *Could* a reasonable officer faced with these same circumstances—here, the totality of Saalim's conduct in the construct of this situation—have determined that this conduct bore the hallmarks of active resistance?
>
> (2) *Could* a reasonable juror conclude that Saalim's behavior indicated compliance?

After watching the video, I am confident that an officer in that same circumstance *could* reasonably have determined that Saalim was actively resisting and not merely unable to comply.

Moreover, no reasonable juror could characterize Saalim's behavior here as "compliance." Therefore, considering the reasonableness of Officer Bretzleoff's actions under the totality of the circumstances leads me to conclude that he is entitled to qualified immunity in this case.

Now the video. In *Scott v. Harris*, 550 U.S. 372, 376 (2007), the Eleventh Circuit had ignored the officer's dashcam video and instead taken the plaintiff's "view of the facts as given" to conclude that those facts could constitute excessive force, so it denied qualified immunity. In reversing—and granting the officer qualified immunity—the Supreme Court said: "The Court of Appeals . . . should have viewed the facts in the light depicted by the videotape." *Id.* at 380-81. When the *Scott* dissent suggested that the Court was "misrepresenting" the events in the video, the Court answered: "We are happy to allow the videotape to speak for itself." *Id.* at 378 n.5.

Here, I likewise find myself happy to allow the video to speak for itself.[1] There is no dispute that this video is admissible—in fact, already admitted—evidence that is relevant and reliable. It is not merely relevant, however; it is dispositive. At trial, the finder of fact (judge or jury) will simply watch the video and determine whether Deputy Bretzloff's actions were within the wide bounds of reasonableness under the circumstances. *See Plumhoff*, 572 U.S. at 774-75 (the excessive-force determination is based on reasonableness under the totality of the circumstances, while "allow[ing] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation"). Saalim's description of the events (from his complaint, deposition, or trial testimony) will be as irrelevant as the district court's description of those events in the underlying opinion and the panel majority's description herein.

More to the point, because the dispositive video is in the record, the court's standard is the same regardless of the motion, be it a motion to dismiss, judgment on the pleadings, summary judgment, or directed verdict. In ruling on any such motion, the court must determine whether any reasonable juror could look at that evidence (i.e., that video) and find the officer's actions impermissibly unreasonable. Therefore, to apply this test properly and efficiently, we (like the district court) must "view[] the facts in the light depicted by the videotape," as the Court

---

[1]Without joining the fray, I will simply note that the majority's description, rendition, or transcription of the events in the video is very different from the district court's description of those same events in that same video.

told us in *Scott*, 550 U.S. at 380-81. *See also Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022) ("Thus, it makes little sense to waste time and effort by ignoring the videos' contents.").

Because I believe the district court appropriately considered the video evidence before it and correctly granted Deputy Bretzloff qualified immunity, I respectfully dissent.