NOT RECOMMENDED FOR PUBLICATION

File Name: 26a0118n.06

No. 25-1053

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| BRAYTON JAMES GROTH, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | **ON APPEAL FROM THE** |
| v. | ) | **UNITED STATES DISTRICT** |
| | ) | **COURT FOR THE EASTERN** |
| | ) | **DISTRICT OF MICHIGAN** |
| NICHOLAS HILL, SCOTT MCINTYRE, and | ) | |
| RAYMOND FAES, | ) | OPINION |
| Defendants-Appellants. | ) | |

**FILED**
Mar 10, 2026
KELLY L. STEPHENS, Clerk

Before: BOGGS, NALBANDIAN, and MATHIS, Circuit Judges.

BOGGS, Circuit Judge.

In this interlocutory appeal under 28 U.S.C. § 1291, Birmingham, Michigan, police officers Nicholas Hill and Raymond Faes seek review of the district court's denial of summary judgment on their motions for qualified immunity on Brayton Groth's § 1983 excessive-force claims against them. They also seek pendent appellate review of the denial of summary judgment on Groth's related state-law assault-and-battery claims. Finally, Faes and Officer Scott McIntyre seek pendent appellate review of the denial of summary judgment on Groth's state-law malicious-prosecution claim against them.[1]

---

[1] The City of Birmingham and two other officers (Officers Paredes and Krumm) were parties to the suit below, but the district court dismissed all claims against them. Officers Hill, McIntyre, and Faes, in their individual capacities, are the only remaining defendants.

Under 28 U.S.C. § 1291, we have jurisdiction over an interlocutory appeal of a denial of qualified immunity only if defendants accept the plaintiff's version of genuinely disputed facts for purposes of appeal and contend that they are entitled to qualified immunity even on those facts. *Williams v. Mehra*, 186 F.3d 685, 690 (6th Cir. 1999) (en banc) (citing *Johnson v. Jones*, 515 U.S. 304, 311 (1995)).  The officers do not do that here.  Instead, they advance an intertwined factual and legal narrative based on Groth's claimed "immediate aggression," "fighting," "violen[ce]," and "active resistance," *see, e.g.*, Br. of Appellant at 3, 16, 21, 27–28, 31, 34, 35, 37, 44, 46, 49–51, despite the district court's conclusion that a reasonable jury could find at most passive resistance and notwithstanding body-camera footage that is obstructed or inconclusive at critical moments.[2]  Absent either a concession of the facts material to this appeal or unambiguous video evidence resolving those disputes, this court lacks jurisdiction to review the denial of qualified immunity—and, with no independent federal jurisdictional basis, to review the pendent state-law claims as well.  We therefore dismiss this appeal for lack of jurisdiction.

## 1.  Facts

In this appeal, the parties proffer police body-camera footage in support of their respective positions.  On interlocutory review of a denial of qualified immunity, we ordinarily accept the plausible facts as stated by the district court and the inferences that it drew.  But where video evidence clearly depicts the critical events and "blatantly contradict[s]" the district court's account, we view the facts as shown by the video. *Jackson-Gibson v. Beasley*, 118 F.4th 848, 851 n.1 (6th Cir. 2024) (citing *Scott v. Harris*, 550 U.S. 372, 380–82 (2007)).  Because no such contradiction

---

[2] When asked at oral argument whether the defendants would concede the facts in the light most favorable to the plaintiff for purposes of appeal, counsel for the officers declined to make that concession. *See* Oral Arg. at 1:55–2:05, 2:31–2:58.

exists here, what follows is the district court's version of the facts and reasonable inferences, supplemented where appropriate by undisputed portions of the record.

I

On July 10, 2021, police in Birmingham, Michigan, received a call alleging that Brayton Groth ("Groth") had just assaulted his wife, Katherine Groth ("Katherine"), at their home. Summary Judgment Order, R. 55, PID 1218. Katherine had reported the alleged assault to a passerby outside, who then called 911. *Ibid*.

**A. Officer Krumm's Bodycam Footage:**

Officers Hill and Krumm arrived on the scene first, and they found Katherine sitting in her car several blocks from the house. *Ibid*. Upon questioning, Katherine explained that, during an argument, Groth became agitated, poured lukewarm coffee on her, and removed her from the house by her hair. *Id.* at 1219; Krumm Footage at 12:00-03. (Groth denied the assault in his deposition and continues to deny it on appeal. R. 55, PID 1219; Brayton Groth Dep., R. 46-1, PID 914-15; Br. of Appellee at 4-5.)

Officer Krumm asked Katherine if she had a key to the house, but she was reluctant to provide it, telling him that "I don't want anybody going into the house." Krumm Footage at 5:30-36. Krumm replied that, because of what had transpired—a domestic violence incident that bruised her arm—officers were going to have to speak with her husband. R. 55, PID 1219; Krumm Footage at 5:40-43. They needed a key to the house, Krumm explained, because Groth was not opening the door to officers on the scene. *Ibid*.

Asked if her husband would meet the police with aggression, Katherine said that he would be "freaked out" and that she was not sure what he would do. Krumm Footage at 6:25-30. (Earlier in the interaction, she had also insinuated that any police encounter would result in her husband

3

getting tackled.  R. 55, PID 1219; Krumm Footage at 6:18-22.)  However, she stated that, to her knowledge, he did not have any weapons.  R. 55, PID 1219-20; Krumm Footage at 6:37.

Despite Katherine's initial reluctance, Krumm obtained the key from her and gave it to Officer Paredes, who had just arrived in his patrol car; Paredes then proceeded to the couple's residence.  R. 55, PID 1220; Krumm Footage at 7:38-40.  Krumm next advised officers at the house by radio that Groth had grabbed his wife by the hair and dragged her out of the house, that she had a bruised elbow, and that he might be "freaked out" if police entered.  R. 55, PID 1220; Krumm Footage at 9:45-10:01.

Turning his attention back to Katherine, Krumm reassured her that officers wanted to "just go in and talk to" her husband; she replied that "he's not gonna accept that."  Krumm Footage at 10:14-18.  Krumm insisted that most people would not fight with or scream at police who were simply there to talk.  She responded that her husband would.  R. 55, PID 1220; Krumm Footage at 12:47-54.

### B.  Lieutenant Faes's Bodycam Footage:

While Krumm was speaking with Katherine, Lieutenant Faes and Officers McIntyre, Hill, and Paredes arrived at the Groth residence.  R. 55, PID 1220.  Faes knocked on the front screen door without announcing himself but received no response.  R. 55, PID 1220; Faes Footage at 2:56-58.  Faes, who had been dispatched to the house for a previous incident, repeatedly told other officers that Groth was likely hiding in his basement and refusing to come to the door because he "hates police."  R. 55, PID 1220-21; Faes Footage at 3:10-18, 3:30-40, 4:00-57, 5:35-6:12, 9:57.  He also warned other officers that, while Groth was not known to have a gun, anything was possible and he could have a knife.  R. 55, PID 1221; Faes Footage at 5:15-20.  A few minutes later, after Paredes arrived with the key, Faes stated, "Aw, fuck it.  Let's just go in and say,

'Birmingham Police.' Fuck this guy." R. 55, PID 1221; Faes Footage at 8:10-18. Without announcing themselves, Faes and Paredes then attempted to unlock the front door and, when that failed, tried the key on the back door. R. 55, PID 1221; Faes Footage at 8:20-9:58.

From there, things did not improve. As Faes unlocked the door and opened it halfway, Groth approached from his kitchen on the left, appeared to ask whether there was a warrant, and tried to push the door closed. R. 55, PID 1221; Faes Footage at 10:12-14. Without announcing who he was or why he was there, Faes pushed the door back open, barged into the house, and put his hands on Groth, as Groth tried to back away from the officers and protested that the entry was illegal. R. 55, PID 1221-22, 1232; Faes Footage at 10:16-19. While Faes and Hill have testified at various points that Groth struck, slapped, or pushed Faes in the face or neck area upon entry, Faes's body-camera footage does not clearly depict this alleged assault; the camera is angled downward and only shows Groth's lower body. *Ibid.* Groth also testified that he did not hit Faes. R. 55, PID 1221-22 (citing Brayton Groth Dep., R. 34-6, PID 560).

After putting his hands on Groth, Faes told him to "get on the fucking ground," and, in the very next instant, Faes pushed Groth against a kitchen counter and then threw him to the floor. R. 55, PID 1222; Faes Footage at 10:18-20. Hill and McIntyre then piled on Groth as he lay on the floor in a corner of the kitchen. Here, the officers' bodies obscure most of what is happening, but we do hear Groth continuing to protest that the entry is illegal, as well as an officer warning him that he is going to get tased. R. 55, PID 1222; Faes Footage at 10:21-28. Groth denies physically resisting or hearing any additional commands at this point, and the video likewise does not clearly show Groth receiving any instructions or being informed that he is under arrest. *Ibid*.

After kneeling on Groth for about seven seconds, Hill and McIntyre stood up. As Groth lay on his back, Hill—still not having issued any audible commands—pulled out his taser, yelled

"taser, taser, taser," and, less than a second later, fired the prongs into Groth's chest. R. 55, PID 1222; Faes Footage at 10:28-30. In the seconds leading up to the tasing, Groth's arms were bent at the elbows and held close to his body, then momentarily raised upward, palms facing out. Faes Footage at 10:28-30.

Once the prongs made contact, Groth screamed and rolled onto his side. McIntyre, Paredes, and Hill then rushed toward Groth, and, once again, their bodies obscure what Groth is doing. Even though Groth had been tased just seconds ago, we hear one officer ordering Groth to produce his hands, followed by the sound of Hill deploying his taser again less than a second later, this time without warning. R. 55, PID 1222-23; Faes Footage at 10:33-39.

Officers then commanded Groth to roll over on his stomach, but apart from being in a kitchen nook with limited space to move, Groth had two officers on top of him and a third holding his leg in the air. R. 55, PID 1223, 1235; Faes Footage 10:47-49. An officer then told Groth to "stop fucking fighting," and Groth replied that he was not fighting. Faes Footage at 10:48-54. Once again, Groth's body is obscured by the officers on top of him. *Ibid.* The dim lighting in the kitchen, combined with the poor video quality, further impairs visibility.

Faes and Paredes then pulled Groth to the center of the kitchen by his legs, rolled him over onto his stomach, and managed to secure one hand behind his back. R. 55, PID 1223; Faes Footage at 10:50-11:00. Officers commanded Groth approximately five times to place both hands behind his back. Faes Footage at 10:58-11:18. He refused, responding to one command, "No, you do not have a warrant," and to another, "No, you just tased me." *Ibid.* At the same time, it was unclear whether compliance was possible, as three officers were bearing down on him, limiting his range of motion. R. 55, PID 1235; Faes Footage at 10:58-11:18. And, as in much of this footage, Groth's

movements here are wholly or partially obscured by several officers' bodies, the low resolution of the video, and the darkness of the kitchen.

Groth continued to protest, stating that he was going to call his lawyer. R. 55, PID 1223; Faes Footage at 11:08-16. A few moments later, Faes told Hill to "drive stun" the back of Groth's leg. But as Hill did so, officers already appeared to have Groth on his stomach with both hands behind his back, though the footage is again not crystal clear. R. 55, PID 1223, 1236; Faes Footage at 11:20-29. Nevertheless, and somewhat confusingly, Faes again commanded Groth to put his hands behind his back. *Ibid*.

After this first drive stun, Groth pulled his left hand away from the officers' grasp, brandishing his cell phone and yelling that he had recorded everything. Faes ordered Hill to deploy another drive stun. Hill applied it to Groth's back, and officers were able to place Groth in handcuffs moments later. R. 55, PID 1223, 1236; Faes Footage at 11:36-46.

Groth was charged with domestic violence and with resisting, assaulting, and obstructing police; a state trial judge later dismissed both charges. R. 55, PID 1223-24.

## 2. Qualified Immunity:

### A. Legal Standard

This interlocutory appeal centers on the district court's denial of qualified immunity to Officers Hill and Faes on a Fourth Amendment excessive-force claim under § 1983—Faes for taking Groth to the ground and twice directing Hill to drive-stun him, and Hill for using his taser four times (two dart-mode deployments, followed by two drive-stuns). We review de novo a district court's denial of summary judgment on an officer's qualified-immunity defense. *Heeter v. Bowers*, 99 F.4th 900, 908 (6th Cir. 2024). At summary judgment, an officer receives qualified immunity unless, viewing the facts in the light most favorable to the plaintiff, the officer violated

a clearly established constitutional right. *Ibid.* After an officer raises qualified immunity as an affirmative defense, the plaintiff must show both a constitutional violation and that the right was clearly established at the time of the violation. *Ibid.* We may address those inquiries in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). We also assess qualified immunity on an officer-by-officer basis and, where multiple uses of force are alleged, on a use-by-use basis. *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020); *see Romero v. City of Lansing*, 159 F.4th 1002, 1009–10 (6th Cir. 2025).

Turning to the alleged constitutional violation, the Fourth Amendment protects, among other rights, the right of the people to be free from "unreasonable . . . seizures." U.S. Const. amend. IV. A Fourth Amendment excessive-force claim thus turns on whether the officer's actions were objectively reasonable under the totality of the circumstances confronting him at the time. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Relevant to the inquiry are the severity of the crime suspected, the officer's conduct, and the suspect's conduct—including whether the suspect poses a threat or actively resists. *Feagin v. Mansfield Police Dep't*, 155 F.4th 595, 603 (6th Cir. 2025) (citing *Barnes v. Felix*, 605 U.S. 73, 80 (2025)).

However, Groth must show not only that the officers used force unreasonably, but also that "every reasonable officer would have realized that [the challenged] conduct violated the Fourth Amendment under our then-existing precedent." *Chaney-Snell v. Young*, 98 F.4th 699, 720 (6th Cir. 2024) (internal quotation marks omitted). The burden therefore rests on the plaintiff to identify published, controlling authority with closely comparable facts that would bind a panel of this court and place the constitutional question beyond debate at the time of the incident. *Feagin*, 155 F.4th at 603; *Chaney-Snell*, 98 F.4th at 720 ("In the fact-dependent excessive-force context . . . this test generally requires a plaintiff to identify a highly specific right or a case with analogous

facts."). This exacting standard is designed to shield "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Before addressing the merits, however, we must ensure that we have jurisdiction under 28 U.S.C. § 1291. *Heeter*, 99 F.4th at 908. Relying on *Johnson v. Jones*, 515 U.S. 304 (1995), we have "consistently declined to exercise jurisdiction" over interlocutory appeals of qualified-immunity rulings "where the officer's dispute of facts is crucial to the appeal." *Heeter*, 99 F.4th at 909 (internal quotation marks omitted). Conversely, we have jurisdiction when clear video evidence or a defendant's factual concession allows us to resolve a legal issue without revisiting factual disputes. *Id.* at 910–11. So too when the case presents a "neat abstract issue[] of law" with no factual mooring. *Johnson*, 515 U.S. at 317.

In this appeal, facts are everything. Throughout their briefing in this case, the defendants do not cleanly separate their excessive-force arguments from their version of facts, instead constantly interspersing the two. So because the defendants refuse to concede the district court's version of facts and insist that Groth continually fought the police—which, if true, could well relieve them of liability—clear video footage is our only path to jurisdiction. *See Adams v. Blount County*, 946 F.3d 940, 951 (6th Cir. 2020) (where no video existed, dismissing appeal of denial of qualified immunity in excessive-force case for lack of jurisdiction, because officer's disputes about extent and character of the suspect's resistance were crucial to whether the force that the officer used was objectively reasonable). When certain portions of the video are clearer than others, we may have jurisdiction to review some uses of force but not others. We must therefore "separate an appellant's reviewable challenges from its unreviewable [ones]" and consider our jurisdiction as to each use of force. *Bunkley v. City of Detroit*, 902 F.3d 552, 560 (6th Cir. 2018). Our analysis proceeds accordingly.

9

**B. Analysis**

Before analyzing the encounter, we address a threshold issue:  the defendants argue that Groth failed to carry his burden below of identifying case law that clearly established the asserted constitutional right.  Though the plaintiff does not meet this argument in his brief, it is nevertheless foreclosed by *Elder v. Holloway*, 510 U.S. 510 (1994).  Like Groth, the plaintiff in *Elder* argued before the district court that the law was clearly established but did not cite analogous cases.  *Id.* at 513–14.  The Supreme Court reversed the Ninth Circuit's decision to disregard relevant authority on appeal, holding that a plaintiff does not forfeit the "clearly established" part of his argument by failing to cite particular cases at summary judgment.  Appellate review of qualified-immunity rulings, the Court explained, must proceed with consideration of all relevant precedent. *Id.* at 512–16.  On appeal, Groth continues to argue that the law was clearly established, and he now cites on-point cases, as did the district court below.  Under *Elder*, we must consider those cases and any other relevant authorities.

**I.        Lieutenant Faes's Takedown**

"It is clearly established law that officers may not use gratuitous violence against individuals who are not actively resisting." *Reed v. Campbell County*, 80 F.4th 734, 750 (6th Cir. 2023).  While courts must be careful not to define clearly established rights at a high level of generality, "[d]rawing the line at a suspect's active resistance defines the right at a level of particularity appropriate for a[n] [excessive-force] claim pursued under § 1983." *Coffey v. Carroll*, 933 F.3d 577, 587, 589 (6th Cir. 2019).  Here, Faes's justification for the takedown rests on his and Hill's assertion that Groth struck, "came at," "charged at," or aggressively shoved—in other words, actively resisted—Faes as he entered. *See, e.g.*, Br. of Appellant at 13–14, 17, 27–28, 34–35, 38, 45, 49, 51–52.  But the video does not clearly depict a charge or punch or strike, and Groth

10

denies assaulting Faes.  A reasonable jury, therefore, could find that Groth merely demanded a warrant, attempted to close the door to prevent a warrantless and potentially unlawful entry, and backed away from police while protesting their entry.

In *Reed v. Campbell County*, this court held that a suspect's materially identical conduct in a 2020 incident—demanding a warrant, telling officers responding to a domestic-violence call to leave, and attempting to shut the door on them—could not constitute "active resistance" sufficient to justify a use of force; it therefore denied qualified immunity to an officer who responded by pointing a firearm at the suspect.  80 F.4th at 740–41, 749–51; *see also Harris v. Langley*, 647 F. App'x 585, 590, 592 (6th Cir. 2016) (denying qualified immunity for an unprovoked body slam after homeowner shut the door on police, where no medical exigency, immediate safety threat, or ongoing crime existed).

Furthermore, recall that officers did not inform Groth that he was under arrest, and that Officer Faes took him down less than a second after ordering him to the ground.  By the time of this incident, it was clearly established that, barring a display of violent or erratic behavior, officers may not use physical force against a suspect who is either not told that he is under arrest or is given insufficient time in which to comply with a command.  *Saalim v. Walmart, Inc.,* 97 F.4th 995, 1005–06 (6th Cir. 2024) (collecting cases).  In such circumstances, we have characterized physical and verbal noncompliance, without more, as passive resistance at most.  *Ibid.*

Whether these clearly established rules apply here depends on disputed issues of fact and credibility that the video does not resolve.  *See Osborn v. City of Columbus*, No. 22-3570, 2023 WL 2523307, at *4 (6th Cir. Mar. 15, 2023) ("It is not disputed that [Officer] Ladipo took Osborn to the ground within seconds of their initial encounter.  But the facts surrounding Osborn's [allegedly threatening] behavior prior to the takedown, which are crucial to determine the

reasonableness of Ladipo's initial use of force, are disputed."). Therefore, the court lacks jurisdiction over this portion of the appeal. *See Adams*, 946 F.3d at 951.[3]

## II. Officer Hill's First Deployment of the Taser

"When analyzing excessive force, our circuit often sorts taser cases based on a simple dichotomy—was the suspect actively resisting or not?" *Perez v. Simpson*, 83 F.4th 1029, 1031 (6th Cir. 2023) (citation modified). If a suspect actively resists or exhibits behavior that is on the "hazy border" between submission and active resistance, we generally grant officers qualified immunity for their tasing; conversely, if the suspect's behavior is clearly passive or compliant, as defined in our precedents, we typically deny qualified immunity. *Feagin*, 155 F.4th at 604.

---

[3] The officers also devote substantial briefing to the lawfulness of their entry, invoking both exigent circumstances and Katherine's purported consent. But both theories depend on the same disputed factual premise that underlies their excessive-force argument—namely, that Groth struck or aggressively confronted the officers before refusing them entry. At the time of this incident, it was clearly established that exigent circumstances do not arise where, as here, the alleged domestic-violence victim is known to be outside the home and no one inside faces immediate harm. *Hoover v. Due*, 152 F.4th 749, 762 (6th Cir. 2025). The officers' exigency argument instead rests on their repeated assertions that Groth displayed "immediate aggression," Br. of Appellant at 21, 32, 34–35, none of which the video conclusively establishes. Their consent argument fares no better, as they invoke Katherine's consent primarily to support their claim that her husband withdrew that consent only after assaulting officers, rendering the withdrawal invalid. *See id.* at 35.

We cannot discern from these fact-bound arguments about unlawful entry any purely legal argument about excessive force. For instance, the defendants do not argue that they could have lawfully entered the house, over Groth's objection, if he was nonviolent; indeed, they concede precisely the opposite. *Id.* at 27–28 ("Although Groth could refuse consent, Groth's immediate forceful response . . . allowed the officers to proceed with *the arrest* . . . .") (emphasis added). And they do not clearly contend that if the warrantless entry were lawful, even an occupant's nonviolent acts of refusal, such as shutting the door, protesting, and retreating into the home, would become active resistance. Rather, their entry arguments serve only to reinforce their contested narrative of aggression. But even if the officers were construed as advancing the position that nonviolent refusals to permit a lawful warrantless entry, without more, could justify a takedown, it would find no support in our precedents. *See Reed*, 80 F.4th at 749; *Goodwin v. City of Painesville*, 781 F.3d 314, 326–27 (6th Cir. 2015).

Accordingly, the defendants assert that Groth flailed, kicked, and defied commands to put his hands behind his back after being taken to the ground. Br. of Appellant at 14–15. Groth denies resisting or hearing any commands, and the body-camera footage—obscured at this point by officers' bodies—does not clearly resolve that dispute, nor does the audio capture the alleged commands. Nevertheless, instead of conceding Groth's version of the facts for purposes of this appeal, the defendants rely on their own factual narrative as the predicate for their legal argument. *See, e.g.*, *id*. at 46 ("Officer Hill did not deploy the first taser until *after* . . . Groth [struck] Lieutenant Faes, *and* after both he and another officer struggled on the floor with Groth as he actively resisted the officers' attempts to subdue him."). The defendants use that disputed narrative to analogize this case to decisions approving taser use in response to prolonged, erratic, or violent resistance. *See, e.g.*, *id.* at 44–46 (citing *Hagans v. Franklin County Sheriff's Off.*, 695 F.3d 505, 511 (6th Cir. 2012)). That analogy, however, depends on accepting the officers' version of events.

Under Groth's facts, by contrast, a reasonable juror could find that a number of his then clearly established constitutional rights were violated, including the right not to be tased for passive resistance or non-resistance; the right not to be tased when he was not told that he was under arrest and posed no threat to others; and the right not to be subjected to significant physical force without commands or a meaningful opportunity to comply. *See Osborn*, 2023 WL 2523307, at \*6 (denying qualified immunity for a 2019 incident because whether the aforementioned clearly established rights were violated depended on disputed issues of fact); *Saalim*, 97 F.4th at 1006, 1010 (denying qualified immunity where suspect in 2020 incident "could not have been actively resisting a command he was never given . . . ."). Because we are faced with potentially outcome-determinative disputes about the extent of resistance that video footage cannot resolve, "[t]his is precisely the sort of factual dispute over which this Court lacks jurisdiction." *Thompson v. Grida*,

656 F.3d 365, 368 (6th Cir. 2011). This portion of the appeal must therefore be dismissed under *Johnson*.

### III. Officer Hill's Second Deployment of the Taser

The same jurisdictional defect arises here. The defendants contend that Groth actively resisted arrest in the moments preceding the second taser deployment. Br. of Appellant at 14–15. The district court concluded, however, that a reasonable jury could reject that characterization and find at most passive resistance. It explained that at this point the body-camera footage is obstructed by officers' bodies, that the audio does not capture any clear resistance, and that the defendants do not identify what specific conduct constituted active resistance during these moments. Summary Judgment Order, R. 55, PID 1234–35.

Upon review, the video does not conclusively depict Groth's actions, nor does it clearly resolve what commands he had been given earlier, how much resistance he had displayed up to that point, or whether he had a meaningful opportunity to comply with commands issued immediately before the taser was deployed. Groth, for his part, denies resisting. Because the defendants have not conceded the plaintiff-favorable view of the facts that the district court held a jury could find, their argument that the taser was justified as a response to active resistance depends on reweighing disputed evidence. Under *Johnson*, we lack jurisdiction to resolve that fact-bound dispute on interlocutory appeal.

### IV. First Drive Stun by Officers Faes and Hill

Our review of the first drive stun runs into the same problem. Whether a noncompliant suspect was actively resisting turns on whether compliance was feasible from the perspective of a reasonable officer. *See Goodwin v. City of Painesville*, 781 F.3d 314, 321, 324–25 (6th Cir. 2015) (finding that suspect who convulsed involuntarily due to taser shocks was not resisting); *Martin v.*

*City of Broadview Heights*, 712 F.3d 951, 959 (6th Cir. 2013) (holding that a reasonable jury could find that a suspect's flailing was an attempt to gasp for air while in an officer's chokehold rather than active resistance). In *Osborn v. City of Columbus*, as in our case, "[i]t [was] undisputed that [officers] gave [the plaintiff] commands [to roll over and put his hands behind his back that] he did not comply with. But whether he was able to comply with the commands is disputed, which impacts whether the repeated . . . tases [sic] were reasonable." 2023 WL 2523307, at *5. The district court drew precisely that inference here. R. 55, PID 1236 ("[S]ince three officers were bearing down on him, it still is not clear that Groth readily could comply with their commands."). And the video footage does not "blatantly contradict[]" that inference. *See Scott*, 550 U.S. at 380.

Indeed, the footage shows officers bearing down on Groth in a tight corner of the kitchen while controlling his left leg and ordering him to roll over, dragging him to the middle of the room, and then pinning him on his stomach while holding one of his arms as it was extended outward—a position that may have left minimal room for him to rotate the arm behind his back in response to commands. *See Osborn*, 2023 WL 2523307, at *5 (holding that a reasonable jury could find no active resistance where officers were pinning the plaintiff and controlling his limbs while issuing commands, creating a genuine dispute as to whether he was able to comply). Groth's verbal denial that he was fighting is consistent with a person desiring to comply but being unable to do so. *See ibid.* (reaching similar conclusion where video showed plaintiff insisting "you guys, I'm not doing anything," as police were striking and tasing him).

Most importantly, in the moments immediately preceding the first drive stun, Groth's body is largely obscured by the officers on top of him, the kitchen is dark, and the video quality is poor. Although it appears that officers may already have had Groth's hands behind his back—an indication of submission—the obstructed view and lighting prevent any definitive conclusion.

Because the officers refuse to concede the district court's permissible inference that a jury could find Groth was not actively resisting—either because he was unable to comply or because his hands were already behind his back—and because the video does not conclusively resolve these crucial facts, we lack jurisdiction to revisit this fact-bound dispute on interlocutory appeal.

## V.      Second Drive Stun by Officers Faes and Hill

Although Groth's refusals to place his hands behind his back and his arm movement immediately preceding the second drive stun are captured on video, we still lack jurisdiction because the lawfulness of that force turns on disputed facts.  The following comparison explains that conclusion.

Applying this circuit's taser jurisprudence to an April 2020 incident occurring roughly a year before Groth's, the court in *Saalim v. Walmart* explained that we have "found passive, not active, resistance . . . when suspects move their arms slightly while officers are attempting to handcuff them or otherwise gain control of them."  97 F.4th at 1006.  That conclusion is "particularly true when," as in Groth's case, "the plaintiff had not been told he was under arrest." *Ibid.*

Consistent with that principle, this court denied qualified immunity for a 2019 tasing in *Shumate v. City of Adrian*, 44 F.4th 427, 450 (6th Cir. 2022), concluding that conduct materially analogous to Groth's did not constitute active resistance.  Like Groth, Shumate was not told that he was under arrest before receiving multiple tasings. *Id.* at 448.  And just as Groth refused several commands to put his hands behind his back, Shumate refused three separate commands over approximately forty seconds:  first to leave the CVS parking lot where he was allegedly interfering with a traffic stop; then to put his hands behind his back; and finally to put his hands behind his back and get on the ground. *Id.* at 434–35.

However, unlike Groth, who was pinned down while being commanded, Shumate was on his feet, unrestrained, and fully capable of compliance. And Shumate was more verbally hostile than Groth, asking the officer, "You got a problem with me now?" and repeatedly swearing at him and giving him the middle finger. *Ibid.* By contrast, Groth's statements consisted mainly of protests that the police's actions were unlawful. Crucially, however, neither suspect made physical threats nor engaged in overtly assaultive conduct. *Id.* at 447–48.

And like Groth, after being ordered to put his hands behind his back, Shumate pulled his arms away from the officer as the officer attempted to gain control of him. *Id.* at 435, 447. After being ordered again, Shumate compounded his resistance by walking backward and announcing that he would not comply because he had done nothing wrong. *Id.* at 435. After swearing at the officer, disobeying three commands, and twice moving his body away to avoid handcuffing, Shumate was finally tased. *Ibid.* Nevertheless, this court denied qualified immunity, holding that Shumate's resistance up to that point was at most passive—particularly because he "was not told that he was under arrest until after [the officer] tased him three times and used physical force." *Id.* at 449–50.

*Saalim* and *Shumate* distinguished those circumstances from cases in which a suspect's refusal to produce his hands was deemed active resistance because it was the culmination of a broader pattern of erratic, belligerent, or threatening behavior. *Saalim*, 97 F.4th at 1007–08; *Shumate*, 44 F.4th at 447–48; *see Bell v. City of Southfield*, 37 F.4th 362, 365, 368 (6th Cir. 2022) ("indisputable video evidence" that a suspect had refused numerous commands to get on the ground, had to be wrestled to the pavement, and then *repeatedly* pulled his arms away from officers); *Hagans*, 695 F.3d at 507 (6th Cir. 2012) (suspect had earlier been running from police, trying to get inside their cruiser, disobeying commands, kicking at them, and reaching for an

officer's taser); *Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 94, 96 (6th Cir. 2012) (suspect had attempted to flee police and expressed his desire to commit suicide-by-cop); *cf. Barnes*, 605 U.S. at 80 ("Prior events may show, for example, why a reasonable officer would have perceived otherwise ambiguous conduct of a suspect as threatening. Or instead they may show why such an officer would have perceived the same conduct as innocuous.").

Whether Groth's conduct falls on the *Saalim-Shumate* side of that distinction, the *Caie–Hagans-Bell* side, or the "hazy border," *see Feagin*, 155 F.4th at 604, ultimately turns on disputed factual questions concerning the nature and extent of his prior resistance. The defendants have not conceded the plaintiff-favorable view of the facts that the district court held that a jury could find. *Compare* Summary Judgment Order, R. 55, PID 1234–36 (holding that a reasonable jury could find that Groth, having been pinned down, was unable to comply with many commands and exhibited, at most, passive resistance), *with* Br. of Appellant at 46 ("Groth continued to physically struggle with the officers for over a minute, actively resisting and refusing to give the officers his hands."). Nor does the video conclusively resolve those disputes: it does not show any assault on Lieutenant Faes, it often obscures Groth's conduct as officers' bodies block the camera, and it provides no clear basis for assessing Groth's ability to comply while officers bore down on him. This portion of the appeal must therefore be dismissed for lack of jurisdiction. *See Heeter*, 99 F.4th at 911 (holding that clear video evidence showing every significant fact but one, which the officer expressly conceded for purposes of appeal, was the predicate for jurisdiction over interlocutory appeal of denial of qualified immunity).

## VI.    The Defendants' Response

The officers attempt to overcome these jurisdictional hurdles by relying heavily on *Feagin v. Mansfield Police Department* for the proposition that this court may exercise interlocutory

jurisdiction whenever an appellant frames his challenge as raising "cascading legal questions." 155 F.4th at 608–09. But *Feagin* does not dispense with *Johnson*'s core limitation on fact-bound appeals. In *Feagin*, the video evidence "vividly t[old] the tale" and "largely capture[d] the incident in question and le[ft] few facts in dispute," *id.* at 601–02, allowing us to resolve the constitutional and clearly-established-law questions without reweighing contested evidence. By contrast, where, as here, the video is obstructed or inconclusive at critical moments, the district court has permissibly concluded that a jury could find at most passive resistance, and the defendants refuse to accept that factual posture for purposes of appeal and base their legal arguments on a counternarrative, *Johnson* continues to foreclose interlocutory review. *See Barry v. O'Grady*, 895 F.3d 440, 443–44 (6th Cir. 2018); *Adams*, 946 F.3d at 951; *Heeter*, 99 F.4th at 911; *Thompson*, 656 F.3d at 368; *Williams*, 186 F.3d at 690. *Feagin* thus confirms, rather than undermines, that appellate jurisdiction exists only where the legal question can be answered on the plaintiff-favorable facts without revisiting disputed issues as to what occurred.

### 3. State-Law Tort Claims

The defendants also ask that the court exercise pendent appellate jurisdiction over Groth's state-law claims for assault and battery and malicious prosecution. However, because the court lacks jurisdiction over the qualified-immunity issue, it likewise lacks pendent appellate jurisdiction over the state-law claims. *Hooks v. City of Warren*, 2025 WL 1542294, at *7–8 (6th Cir. May 30, 2025). "The officers have presented no other basis for us to consider these claims on appeal." *Id.* at *8.

The malicious-prosecution claim is nonreviewable for yet another reason. A pendent claim, to be reviewable at the court's discretion, must be "inextricably intertwined with matters over which the appellate court properly and independently has jurisdiction." *Summers v. Leis*, 368

F.3d 881, 889 (6th Cir. 2004) (citation modified). Malicious prosecution is not "inextricably intertwined" with the excessive-force issues raised on interlocutory appeal because it turns on several distinct elements unrelated to the use of force. That is especially true as to McIntyre, who is not even a defendant in the excessive-force portion of the appeal.

The state-law claims must therefore be dismissed for lack of pendent appellate jurisdiction.

### 4. Conclusion

For the foregoing reasons, we dismiss this appeal for lack of jurisdiction under 28 U.S.C. § 1291.